United States District Court
Southern District of Texas

**ENTERED**

August 22, 2023

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| ROY LEWIS, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 3:22-cv-00067 |
| | § | |
| UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

This is a dispute over disability insurance benefits. Plaintiff Roy Lewis ("Lewis") filed suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, against Unum Life Insurance Company ("Unum Life"), alleging that Unum Life wrongfully denied his claim for long term disability benefits. Pending before me is Unum Life's Motion for Judgment Under Rule 52 (Dkt. 9) and Lewis's Motion for Summary Judgment, or Alternatively, Judgment Under F.R.C.P. Rule 52 on ERISA Administrative Record (Dkt. 10-2). After a de novo review of the administrative record, I recommend that Unum Life's motion be **GRANTED**, and Lewis's motion be **DENIED**.

## STANDARD OF REVIEW

The parties agree that this matter should be decided under Federal Rule of Civil Procedure 52 based on the administrative record and the written submissions of the parties. Rule 52 governs actions "tried on the facts without a jury" and requires the district court to "find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(a). In the Fifth Circuit, a district court need not "set out [its] findings on all factual questions that arise in a case." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997). Nor must it "trac[e] the claims issue by issue or witness by witness." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quotation omitted). A district court's findings

"satisfy Rule 52 if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision." *Interfirst Bank of Abilene, N.A. v. Lull Mfg.*, 778 F.2d 228, 234 (5th Cir. 1985).

The parties also agree that Lewis's long-term disability claim should be reviewed under a de novo standard of review. Under a de novo standard of review, I must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden" of showing he is disabled within the meaning of the policy. *Holman v. Life Ins. Co. of N. Am.*, 533 F. Supp. 3d 502, 505 (S.D. Tex. 2021) (quotation omitted). "It remains [Lewis]'s burden to show by a preponderance of the evidence that he is entitled to benefits." *Zurawin v. Unum Life Ins. Co. of Am.*, No. 4:19-cv-1162, 2020 WL 5506588, at *1 (S.D. Tex. Aug. 27, 2020).

## FINDINGS OF FACT

### Lewis's Employment with Hilcorp Energy Company

1.     Lewis started work as a senior accountant for Hilcorp Energy Company ("Hilcorp") on October 7, 2002. This job required the following physical and cognitive demands: (1) mostly sitting, with standing and walking for brief periods of time; (2) lifting, carrying, pushing, and/or pulling up to 10 pounds occasionally; (3) directing, controlling, and planning activities; (4) making decisions requiring analysis of financial data; (5) interacting professionally in work settings to communicate complex information; and (6) working to precise, accurate standards. *See* Dkt. 12-2 at 749.

### The Unum Life Policy

2.     As a Hilcorp employee, Lewis was covered by a long-term disability policy issued by Unum Life to Hilcorp.

3.     The Unum Life policy provides that a covered individual is entitled to 24 months of disability benefits if he is "limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury"; and if he has "a 20% or more loss in [his] indexed monthly earnings due to the same

sickness or injury." *Id*. at 108 (emphasis omitted). The Unum Life policy defines the term "regular occupation" as "the occupation you are routinely performing when your disability begins." *Id*. at 125.

4.      The Unum Life policy states that if an employee is able to work on a part-time basis in his regular occupation but chooses not to, his claim ends. *See id*. at 114.

5.      Under the Unum Life policy, the payment of disability benefits does not begin until a covered individual has been disabled for 180 days. *See id*. at 96, 108.

6.      After an employee receives disability benefits for 24 months under the Unum Life policy, he is entitled to further disability benefits only if he is "unable to perform the duties of any gainful occupation for which [he is] reasonably fitted by education, training or experience." *Id*. at 108.

7.      The Unum Life policy contains a 24-month limitation for disabilities based primarily on self-reported symptoms or due to mental illness. *See id*. at 114. The Unum Life policy explains that self-reported symptoms

> means the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue . . . .

*Id*. at 125.

**The 2018 Motorcycle Accident and Its Aftermath**

8.      Lewis was involved in a low-speed motorcycle accident on August 3, 2018. He was taken to the emergency room where he reported that he had a headache and lower back pain, but he denied having trauma. *See id*. at 357. He was diagnosed as having right-leg contusion and hematoma of the lower back, and he was released. *See id*. at 358. The medical records from the emergency room do not indicate that doctors diagnosed Lewis with a traumatic brain injury, concussion, or neurological disorder. *See id*.

9.      On August 20, 2018, less than three weeks after the motorcycle accident, Lewis returned to work at Hilcorp on full-time basis. *See id.* at 750.

10.     In the months following the accident, Lewis visited a number of doctors, complaining of knee pain, hip pain, and severe headaches.

11.     On May 17, 2019, Lewis first visited Dr. Huma Haider, a neurologist at the National Brain Injury Institute ("NBII"). Lewis complained to Dr. Haider that he was experiencing headaches twice a week, most often in the evenings, with durations of between four to 10 hours each.

12.     Throughout the rest of 2019 and into 2020, Lewis continued to seek treatment from NBII roughly every six months. During this time period, NBII prescribed various medication to Lewis, encouraged him to implement general stress management techniques, and recommended that he take various steps to improve his home environment.

13.     At no time during 2019 or 2020 did any medical professional at NBII, including Dr. Haider, indicate that Lewis was unable perform his accounting job at Hilcorp. To the contrary, NBII reported in a July 4, 2019 report that Lewis's ability to work as an accountant was only "mildly compromised." Dkt. 12-5 at 332.

14.     In September 2019, NBII had Lewis submit to a Diffusion Tensor Imaging ("DTI") study. The DTI results found abnormalities that "correlate with [Lewis]'s clinical, cognitive, and behavioral deficits." Dkt. 12-2 at 256.

**The Initial Disability Claim**

15.     Lewis underwent a total left hip replacement on September 8, 2020. As a result of this operation, Lewis initiated a disability claim, maintaining that he was first unable to work on September 8, 2020, the date of the hip replacement surgery.

16.     On October 19, 2020, Dr. Vasilios Mathews, the orthopedic surgeon who performed the left hip replacement surgery, released Lewis to return to work on a full-time basis without restriction on November 5, 2020. *See id.* at 85.

17.     On October 29, 2020, Dr. Haider provided a "Work Restrictions" letter, which provided that Lewis could return to full-time work, with the following restrictions:

✓ Allowing the employee to focus on one task at a time

✓ Allow tools to record information for easy retrieval

✓ Provide written as well as verbal instructions

✓ Limit verbal instructions to shorter, manageable chunks of information

✓ Allow additional training time

✓ Assistance with difficult/complex tasks

*Id.* at 78.

18.     On November 16, 2020, Dr. Mathews confirmed to Unum Life that he did not advise Lewis to remain out of work beyond November 4, 2020. *See id.* at 80.

**The Long-Term Disability Claim**

19.     On January 19, 2021, Lewis submitted a Long-Term Disability Claim Form. In that form, he claimed he suffered from "[t]raumatic brain injury with accompanying symptoms of neurocognitive impairment" as a result of the August 2018 motorcycle accident *Id.* at 198. He further alleged that the first day that he was unable to work due to this medical condition was November 5, 2020, which was a mere week after Dr. Haider had specifically stated that Lewis could return to full-time work. When asked on the form to identify the specific duties that he was unable to perform due to his medical condition, Lewis replied:

> Analyzing + interpreting data, Complex calculations, Problem solving, Completing multiple complex projects simultaneously, Managing time critical tasks, Managing frequently changing tasks, Excellent verbal communication, Issues with maintaining effective working relationships due to not recognizing social norms, Short term memory losses, severe difficulty in facial recognition needed for effective team building

*Id.* at 199 (cleaned up).

5

20.     In connection with his long-term disability claim, Lewis explained that after he left work in September 2020 for hip replacement surgery, Hilcorp discovered that he had made many mistakes at work. Lewis attributed those mistakes to his August 2018 motorcycle accident and his resulting neurocognitive impairments. *See id.* at 212–14. He claimed he was unable to return to work due to those impairments. As far as his current activities were concerned, Lewis explained that he fished, did a little bit of woodworking, and built bird houses. *See id.* at 216.

21.     On March 23, 2021, Dr. Haider provided an Attending Physician Statement, which stated that Lewis suffered from a traumatic brain injury with neurocognitive deficit. *See id.* at 299–301. Dr. Haider left blank a question asking whether she had advised Lewis to stop working. *See id.* at 299. She also listed Lewis's behavioral health restrictions and/or limitations as "[u]nable to tolerate stress and repetitive sounds due to trigger post traumatic headaches" and "[h]istory of depression." *Id.* at 300. She further indicated that these restrictions and limitations had been in place since August 3, 2018, the date of the motorcycle accident. *See id.*

22.     On May 19, 2021, Alyssa Johns, RN ("Nurse Johns") completed a clinical review. After summarizing the medical information, Nurse Johns noted:

> In summary, [Lewis] went [out of work] to undergo a left hip [total hip arthroplasty] and remains [out of work] for reports of cognitive impairment. Information in the file would support that [Lewis] would be precluded from . . . activities . . . from 9/8/20-11/4/20 after which time he was released to [return to work full time] . . . . From a cognitive perspective, [Lewis]'s head injury occurred in 2018. He was able to work with this injury previously. This condition would not be expected to get progressively worse. Information in the file does not support a cognitive loss.

*Id.* at 691. Nurse Johns then consulted with an on-site physician ("OSP"), Dr. Jessika Morin, to discuss the next steps.

23.     On May 21, 2021, Dr. Morin noted that "[o]n preliminary review, the available medical records do not appear to support that [Lewis] lacked the functional capacity to perform the physical and/or cognitive demands of his

occupation." *Id.* at 707. Dr. Morin suggested that a neurology consult was needed. *See id.*

24.     Dr. Julie Guay completed a neuropsychology consultation on May 27, 2021. She noted that Lewis's scores on cognitive testing conducted by NBII "were inconsistent," attributing such results to a variety of factors. *Id.* at 711. Dr. Guay added: "Without additional performance validity testing, it is unclear if lower scores reflect actual cognitive decline or other factors, such as emotional functioning, somatic concerns, impression management, etc." *Id.* Dr. Guay further observed that the medical records from the immediate aftermath of the August 2018 motorcycle accident "reflect normal mental status during the acute phase of injury with a normal Glasgow Coma Scale score, no visual evidence of head injury, no evidence of acute injury on CT scan, and no diagnosis of "[traumatic brain injury], concussion, or any neurological disorder." *Id.*

25.     On May 28, 2021, Dr. Morin called Dr. Haider "to gain a better understanding of [her] medical opinion and discuss questions [Dr. Morin had] regarding [Dr. Morin's] interpretation of the available medical data." *Id.* at 715. Dr. Morin also sent Dr. Haider a letter seeking her input. Dr. Haider did not respond to the phone call or the letter.

26.     On June 14, 2021, Dr. Morin conducted an OSP review "to assess if the available medical information supports that [Lewis] remains precluded from his own occupational demands full-time." *Id.* at 732. Dr. Morin discounted the abnormal findings of the DTI examination:

> Review of the available medical file suggests that Mr. Lewis may have been treated for Attention Deficit Disorder (ADD) . . . as far back at [sic] 9/25/2015. Literature supports that individuals with attention disorders often have abnormal DTI findings. Knowing [Lewis] may have attention dysfunction and given the discovery of non-acute mild diffuse cerebral volume loss on CT scan on 8/3/2018, it would appear that using DTI to diagnose neurocognitive impairment due to traumatic brain injury would render inaccurate results in someone like Mr. Lewis. His underlying chronic issues with focusing would likely confound the DTI results. Finally, [Lewis] had been fully

capable of meeting the cognitive demands of his occupation despite a potential attention disorder prior to the accident, a time when he could potentially have had the same DTI findings as he has had since the accident.

*Id.* at 733. After reviewing and analyzing the available medical and clinical evidence, Dr. Morin reached this conclusion:

[T]he medical record fails to support that [Lewis] was precluded from performing the occupational demands . . . on a full-time sustained basis, as of 11/5/2020 and beyond. It was at this time that [Lewis]'s orthopedic surgeon released him to return to work full-time status-post total left hip replacement.

*Id.* at 734. Dr. Morin referred the file to a Designated Medical Officer ("DMO") for a second review.

27.     On June 16, 2021, Dr. Anup Sanghvi completed a DMO review. He agreed with the conclusions reached by Dr. Morin:

There are no specific physical findings in the medical records furnished that suggest the insured would be unable to manage the outlined demands due to a total left hip replacement and mild cognitive dysfunction.

The records indicate normal exam findings with no quantified findings or specific examples of [Lewis]'s presentation to confirm impaired cognitive or physical functioning that would preclude the performance of the tasks reported above.

*Id.* at 740.

**Denial of the Long-Term Disability Claim and Subsequent Appeal**

28.     On June 18, 2021, Unum Life informed Lewis that his long-term disability claim had been denied. The denial letter stated:

Based on our analysis [of the available medical information], we have determined you were not limited from performing the demands of your regular occupation as of November 5, 2020 and beyond. As this is prior to the date your Long Term Disability benefits would have begun, your claim has been closed and no benefits will be payable.

*Id.* at 751.

29.     By letter dated December 17, 2021, Lewis appealed Unum Life's initial disability determination. In connection with the appeal, Lewis's counsel submitted four additional affidavits (one from Lewis, one from his wife, one from his mother, and one from a friend), a one-page note from Dr. Haider dated November 29, 2021, and recommended restrictions from Dr. Haider dated November 29, 2021. *See* Dkt 12-4 at 127–136. In her note, Dr. Haider claimed that Lewis was "unable to engage in full time work, even if sedentary, on any sustained basis" due to his physical and mental conditions. *Id.* at 132. Dr. Haider offered these opinions even though Lewis's last office visit took place on April 28, 2021, approximately seven months before her note. *See* Dkt. 12-5 at 372.

30.     Upon receipt of the appeal, Unum Life had Susan Grover, RN ("Nurse Grover") complete a clinical file review. Nurse Grover wrote:

> Dr. Haider continues to advise that [Lewis] is permanently disabled from any type of gainful employment due to mild neurocognitive deficits secondary to [traumatic brain injury]. These [restrictions and limitations] are overly restrictive based on the medical data in the file. His trauma/[traumatic brain injury] was in Aug[ust] 2018 and [emergency room] visit does not document any head trauma with normal CT brain/head. He continued to work until Sept[ember] 2020 . . . , which is not consistent with [a diagnosis] of [traumatic brain injury], as this condition would not be expected to get progressively worse. His most recent [office visit notes] by Dr. Haider do not include physical exams and there is no clinical or diagnostic data supporting neurocognitive deficits. His [headaches] and anxiety/depression have improved on medication. His activities such as ability to drive are not consistent with a significant cognitive impairment.

Dkt. 12-10 at 157.

31.     Unum Life also had Dr. Neal Greenstein conduct an appeals physician review. He completed his work on January 6, 2022. Like the overwhelming majority of medical professionals who analyzed Lewis's medical records, Dr. Greenstein concluded that:

> [I]n my opinion, the existence, intensity, frequency, and duration of [Lewis]'s reported symptoms, including but not limited to

9

post-traumatic    headaches,    dysphagia/aphasia,    dizziness,
depression/anxiety, hearing loss, blurred vision, sleep disturbance,
cognitive issues, pain, and fatigue is not consistent with all the
physical exams, diagnostic findings, and reported activities, including
his continued working for two years beyond the [motor vehicle
accident], and thus, would not preclude [Lewis] from performing the
occupational demands as defined in the question from 11/05/2020
through 03/07/2021.

*Id.* at 170.

32.     On January 24, 2022, Unum Life informed Lewis that his appeal had
been denied. In that letter, Unum Life provided a lengthy discussion of the medical
evidence, concluding that there was no support "for restrictions and limitations
that would limit [Lewis] from performing activities consistent with his
occupational demands [for 180 days after his last day of work]." *Id.* at 198.

## CONCLUSIONS OF LAW

1.     Lewis has not proven by a preponderance of the evidence that he is
"disabled" under the Unum Life policy.

2.     Unum Life's decision that Lewis was not entitled to long-term
disability benefits under the Unum Life policy was correct.

3.     The medical evidence indicates that (i) Lewis is capable of performing
the duties of a senior accountant at Hilcorp; and (ii) Lewis has the functional
capacity to meet the physical and cognitive demands of a senior accountant at
Hilcorp.

4.     Lewis has failed to demonstrate, as the Unum Life policy requires, that
he is "limited from performing the material and substantial duties of [his] regular
occupation due to [his] sickness or injury." Dkt. 12-2 at 108 (emphasis omitted).

5.     Although Lewis initiated a disability claim due to left hip replacement
surgery he underwent in September 2020, his doctor released him to return to
work on November 5, 2020. Because Lewis only missed approximately two months
of work as a result of his hip replacement surgery, he was not entitled to long-term
disability benefits as a result of the hip replacement surgery. This is because the

Unum Life policy only permits the payment of long-term disability benefits once a covered individual has been disabled for 180 days.

6.      Only after Dr. Mathews, Lewis's orthopedic surgeon, released him on November 5, 2020 to return to work on a full-time basis without restriction did Lewis contend, for the very first time, that he was unable to work due to neurocognitive impairments allegedly caused by an August 2018 motorcycle accident. Importantly, Lewis worked full-time at Hilcorp from late August 2018 (a few weeks after his motorcycle accident) until he had his hip replacement surgery in September 2020. This was a period of roughly two and a half years. The fact that Lewis was able to work for two and half years after his motorcycle accident is persuasive evidence that the motorcycle accident did not cause him to suffer from a debilitating neurocognitive condition that precluded him from working.

7.      Lewis's disability claim is based entirely on Dr. Haider's assertion in November 2021 that Lewis is unable to work due to neurocognitive issues. I do not find Dr. Haider's testimony credible. Even though Dr. Haider and others at NBII began treating Lewis in May 2019, the first and only time Dr. Haider opined that Lewis could not work again was in November 2021. Before that date, Dr. Haider and her colleagues at NBII never raised any concern that Lewis might be unable to perform the basic functions of an accountant, even though they were well aware that he was working as an accountant at Hilcorp until he went on leave for his hip replacement surgery in September 2020. By way of example, NBII's records from July 4, 2019 expressly acknowledge that Lewis could work, stating that Lewis's ability to work as an accountant was only "mildly compromised." Dkt. 12-5 at 332. Dr. Haider even provided a letter on October 29, 2020, clearly stating that Lewis could return to full-time work, with certain restrictions. This is a mere week before Lewis alleges his disability period began. Then, when directly asked in a claims form in March 2021 whether she advised Lewis to stop working, Dr. Haider did not answer the question. *See* Dkt. 12-2 at 299. I find it curious (and concerning) that Dr. Haider is willing to offer a November 2021 opinion about Lewis's cognitive

state when the last time Lewis visited anyone at NBII for treatment was approximately seven months earlier, in April 2021.

8.      Although Dr. Haider takes the position that Lewis suffered from a debilitating neurological disorder as a result of the 2018 motorcycle accident, I am not convinced. The overwhelming medical evidence supports the view that Lewis is able to work. The record consists of four separate medical reviews—Drs. Greenstein, Guay, Morin, and Sanghvi—that all conclude that Lewis could return to work. Those medical evaluations are far from cursory; they provide detailed explanations and reasoning why Lewis's cognitive complaints did not square with the medical evidence. All in all, I have carefully considered the medical opinions offered by Dr. Haider and the four doctors who conducted medical reviews. I am persuaded by the opinions of the four medical reviewers.

9.      I am not required to automatically "accord special weight to the opinions of [Lewis]'s physician," Dr. Haider. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Love v. Dell, Inc.*, 551 F.3d 333, 337 (5th Cir. 2008) ("ERISA does not require the opinions of treating physicians to be preferred over those of other physicians reviewing a file; ERISA merely requires that the opinions of treating physicians, as with all evidence submitted by the claimant, actually be taken in account in an administrator's determination.").

10.     Independently, the administrative record demonstrates that Lewis had at least a part-time capacity for work in his regular occupation. Because the Unum Life policy provides that a claim ends when the employee is able to work in his regular occupation on a part-time basis but chooses not to do so, this is an additional reason why Lewis's long-term disability claim should be denied.

11.     ERISA provides that a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). When determining whether to award attorney's fees under § 1132(g)(1), a district court is required to consider five factors:

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Iron Workers Loc. No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980). Although both parties have requested an award of attorney's fees, neither side explains *why* it should receive attorney's fees. This is reason alone to deny their request. *See Menchaca v. CNA Grp. Life Assurance Co.*, No. H-07-cv-0825, 2008 WL 11454762, at *14 (S.D. Tex. Aug. 15, 2008) ("Although defendants have included a request for attorney's fees in their briefing, they have not included an analysis of factors that courts use to decide whether such fees should be awarded. Accordingly, defendants' request for attorney's fees will be denied."). Additionally, I have considered each of the five attorney's fees factors identified by the Fifth Circuit. The majority of factors do not support an award of attorney's fees. Neither side acted in bad faith or is culpable of wrongdoing, there is no conduct to deter in this case, and the parties did not seek to benefit all plan participants or resolve a significant legal question regarding ERISA. Using my discretion, I find that an award of attorney's fees is not justified in this case.

## CONCLUSION AND RECOMMENDATION

Based on my Findings of Fact and Conclusions of Law made after a de novo review of the administrative record, I **RECOMMEND** that Unum Life's Motion for Judgment Under Rule 52 (Dkt. 9) be **GRANTED**; and Lewis's Motion for Summary Judgment, or Alternatively, Judgment Under F.R.C.P. Rule 52 on ERISA Administrative Record (Dkt. 10-2) be **DENIED**. Lewis is not entitled to long-term disability benefits under the Unum Life policy. I further recommend that both parties' requests for attorney's fees be **DENIED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(c); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 22nd day of August 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE